UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RDI OF MICHIGAN, LLC,

    Plaintiff,

v.                                        Case No. 08-11177
                                          Hon. Lawrence P. Zatkoff

MICHIGAN COIN-OP VENDING,
INC, JORDAN MIRCH, and DOES
I-V and ROES VI-IX,

    Defendants.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on December 4, 2008

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction (Docket #2). The parties have filed multiple response and reply briefs and the Court has held two hearings on this matter. For the reasons set forth below, Plaintiff's Motion for Preliminary Injunction is GRANTED. In this Opinion, the Court also addresses Plaintiff's Motion to Strike Polygraph Report (Docket #31). As discussed below, Plaintiff's Motion to Strike Polygraph Report is GRANTED as well.

**II. BACKGROUND**

According to Plaintiff, it has an exclusive license in Michigan for the copyrights and trademarks to certain video poker games, specifically the Merit "Superstar" or "Americana" video poker games (the "Video Poker Games"). Pursuant to a Lease Agreement dated April 9, 2007,

between Defendants Michigan Coin-Op Vending, Inc. ("Coin-Op) and Jordan Mirch (the owner of Coin-Op ("Mirch")), as lessees, and Plaintiff, as lessor, Plaintiff granted Coin-Op and Mirch a valid license to distribute the Video Poker Games to restaurants, bars and halls throughout Michigan. Defendants distributed approximately 127 such Video Poker Games under the terms of the Lease Agreement. Significantly, in entering into the Lease Agreement, Defendants admitted that they had engaged in unlicensed copying of one or more Video Poker Games prior to April 2007.

In the present action, Plaintiff alleges that Defendants began illegally copying the Video Poker Games (and/or the computer source code from which the Video Poker Games derive) again in January 2008.[1] Such illegal copying generally involved using a Eprom chip burner and ultraviolet eraser to quickly copy or create U9 computer chips. In support of its Verified Complaint and Motion for a Temporary Restraining Order, Plaintiff submitted affidavits from two former employees of Coin-Op. Both former employees state that Coin-Op (Mirch) ordered them to, and that they did, assist Mirch in copying computer or circuit boards and/or U9 computer chips using the Eprom chip burner. Both former employees state that this copying occurred during a 48 hour period immediately prior to a preliminary injunction hearing in the Oakland litigation on January 23, 2008. According to the former Coin-Op employees, Mirch expressed to them that this copying needed to be completed quickly so that the authentic circuit boards (those that were obtained legitimately pursuant to the Lease Agreement) possessed by Coin-Op could be taken into Oakland County Circuit Court for the preliminary injunction hearing. In fact, Defendants were able to

---

[1] Actually, Plaintiff has suggested that Defendants began unauthorized copying of Plaintiff's products, thereby breaching the Lease Agreement, in the fall of 2007. Plaintiff initiated a state law action against Coin-Op and Mirch in Oakland County Circuit Court (the "Oakland litigation") in January 2008. In the Oakland litigation, which involves the same parties as this action, Plaintiff sought to prevent Defendants from breaching the Lease Agreement.

2

produce the authentic circuit boards at that hearing and the request for preliminary injunction was denied.

On Wednesday, March 19, 2008, Plaintiff filed a Verified Complaint, Motion for Temporary Restraining Order and Brief in Support Thereof in this Court. On Thursday, March 20, 2008, the Court issued an Ex Parte Temporary Restraining Order, Order to Show Cause Why Preliminary Injunction Should Not Be Entered, and Order for Seizure and Impoundment of Infringing Goods (the "TRO"). The TRO ordered that Defendants and their agents were prohibited from operating, copying, selling, transferring, moving, relocating, disposing of, discarding, secreting, hiding, tampering with, modifying, altering, adjusting or varying any video poker game that incorporates, is copied from, infringes upon, is derivative of or is an enhancement of the Video Poker Games. The TRO also provided that the U.S. Marshals could immediately seize and impound any video poker game (or part thereof) described in the TRO.

On the morning of Friday, March 21, 2008, Plaintiff's owner, one of Plaintiff's attorneys, Kevin Carson (a former employee of Coin-Op ("Carson")) and Dan Pauley (an officer of a district court in Michigan ("Pauley")) (collectively, the "Plaintiff Group") accompanied U.S. Deputy Marshal Scott Machlay ("Machlay") to Coin-Op's premises. Machlay knocked and announced his presence but was not allowed into the premises until Defendants' attorney, Richard Steinberg ("Steinberg"), arrived at Coin-Op and looked at the TRO. Machlay and the Plaintiff Group were allowed to enter the Coin-Op premises, and Machlay was in charge. To the extent that there were conversations with Mirch and/or Steinberg, Machlay spoke on behalf of Plaintiff and was responsible for executing the search/seizure process allowed under the TRO. Steinberg and Mirch told Machlay that there were no materials/equipment described in the TRO on the Coin-Op

3

premises. Eventually, Machlay was allowed to look around the warehouse with Steinberg. As Machlay was not able to ascertain whether there was any equipment that fell within the scope of the TRO, Steinberg allowed the entire Plaintiff Group to go to the location in the warehouse where Carson indicated the Eprom chip burner would be located. In fact, the Eprom chip burner was exactly where Carson indicated it would be.

When Steinberg learned Plaintiff had not yet posted bond, he called the Court and the Plaintiff Group was instructed to leave the premises until bond was posted. The Plaintiff Group immediately left the Coin-Op premises.[2] No items were seized by the Plaintiff Group while at Coin-Op that day, but members of the Plaintiff Group have asserted that they saw infringing materials on the Coin-Op premises, including U9 chips, the Eprom chip burner and ultraviolet eraser. Later that day and into the next week, Pauley (and men he assembled) executed the TRO at bars, restaurants and halls in Michigan. When doing so, they removed video machines that allegedly contained infringing materials or chips. At each location, Pauley left a business card of Machlay's (which Machlay had provided him with on March 21, 2008), along with a copy of the TRO.

At a hearing held on March 27, 2008, the Court denied Defendants' motion to dissolve the TRO and held that:

> A. Except as set forth in Paragraphs B, C and D below, the terms of the [TRO] were to remain in place until further order of this Court;

---

[2] At the time Machlay and the Plaintiff Group entered the Coin-Op, Plaintiff admittedly had not submitted a bond or surety bond to the Court. Plaintiff claims that it had applied for a bond already but had not gotten it and filed it with the Court. Plaintiff and its agents maintain that they didn't understand that the TRO required Plaintiff to post bond before the TRO was served on Defendants and executed. Plaintiff promptly obtained a bond and posted it with the Court at 1:17 p.m. on Friday, March 21, 2008. By that time, Mirch had locked and left the Coin-Op premises for the weekend.

>   B.  Defendants were to provide the Court with a list of any locations where equipment allegedly subject to seizure under the [TRO] had not yet been seized;
>
>   C.  Seizures of equipment allegedly subject to the [TRO] were to cease immediately and no further seizures could occur until such time, if any, as the Court ordered otherwise; and
>
>   D.  A preliminary injunction hearing was scheduled for April 30, 2008.

Prior to the April 30, 2008, hearing, however, the parties entered a "Stipulation for Standstill Agreement" which required Defendants to allow an inspection of the Coin-Op warehouse and other locations where the alleged infringing Video Poker Games were located. As a result of the Stipulation for Standstill Agreement, the Court adjourned the April 30, 2008, hearing until such time as (a) the parties stipulated to further involvement of the Court, or (b) the Court ordered the parties back into court.

Plaintiff has since filed a request to have the Court hear the motion for preliminary injunction due to Defendants' alleged continued wrongful activity and non-compliance with Court orders. The Court issued an Order to Show Cause, wherein Defendants were directed to they explain why Plaintiff should not have its motion for preliminary injunction heard and why Plaintiff's motion for preliminary injunction should not be granted. Defendants complied with the Order to Show Cause, and the Court recently held a second hearing regarding Plaintiff's motion on October 14, 2008.

## III. LEGAL STANDARD

A court is to consider the following four factors in determining whether a plaintiff is entitled to preliminary injunctive relief:

>   (1)  whether the movant has shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the movant has shown that it would suffer irreparable harm if the preliminary relief is not issued;

(3) whether the issuance of a preliminary injunction will cause substantial harm to third parties; and

(4) whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995); *UASCO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 98 (6th Cir. 1982); *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). The standard for injunctive relief is not a rigid and comprehensive test, and the four factors are to be balanced, not prerequisites that must be satisfied. Rather, "these factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle-Picher Indus., Inc.* 963 F.2d 855, 859 (6th Cir. 1992).

## IV. ANALYSIS OF INJUNCTIVE RELIEF FACTORS

### A. Likelihood of Success on the Merits

In order to establish a claim for copyright infringement, a plaintiff must show: (1) ownership of a valid copyright, and (2) copying of constituent elements of work that are original. *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1263 (6th Cir. 1985).

*1. Ownership*

Defendants argue that Plaintiff cannot succeed on the merits because there is a legal issue of whether the copyrights asserted by Plaintiff are valid. According to Defendants, there is nationwide litigation as to who holds the copyright - whether it is Merit Industries, Inc. (or a successor corporation ("Merit")) or Larry Hartley (or a business of his), who owns Riviera

Distributors, Inc. ("Riviera"), the company from which Plaintiff has a licensing agreement for the Video Poker Games. Defendants state that there are:

> very substantial questions about whether the 'works' in question were properly copyrighted, or whether they are even entitled to copyright protection. However, more importantly, there are substantial chain-of-title questions which pose threshold questions, even before these issues are substantively addressed.

Defendants also argue that no written license has been produced by Plaintiff to show that Plaintiff is the exclusive licensee in Michigan for (at least some of) the Video Poker Games.

Plaintiff asserts that, even if Defendants are challenging the copyrights, they have no evidence to support that challenge. Merit claimed certain works for hire which were registered with the U.S. Copyright Office. The relevant works include the Merit CRT200, CRT250 and CRT260 circuit boards and the following games in those boards: Riviera Poker, Riviera Americana, Riviera Hi Score, Joker Poker, Double Up and Chicken Poker. On March 12, 2004, Merit assigned these works/games to Riviera pursuant to a Bill of Sale and Intellectual Property Assignment, copies of which have been provided to the Court. As three Certificates of Registration with the U.S. Copyright Office demonstrate, Riviera registered certain Video Poker Games in December 2004.

Riviera entered into an Exclusive Distributorship Agreement (the "License") with Plaintiff with respect to these works/games on March 8, 2007. The License provides that Plaintiff has an exclusive license for Riviera's "products" in the State of Michigan. Pursuant to the License, "products" mean

> the hardware and software sold by [Riviera] to [Plaintiff], which relate to [Riviera]'s proprietary circuit board designed to operate the software based upon the Riviera Americana source code and/or any other video poker games sold by [Riviera].

7

The License also provides that Plaintiff has the right to enforce the "copyrights" within the State of Michigan and to sue for any past, present or future infringement of the copyrights. Pursuant to the License, "copyrights" means

> any and all copyrights owned by [Riviera] covering any of the software, hardware, and/or audiovisual elements, including, but not limited to, computer code and graphic interface, which are incorporated or included in any of the Products; . . .

Based on the foregoing instruments, Plaintiff maintains that it has a license for the Video Poker Games. The Court agrees. The Court finds that the Bill of Sale, Intellectual Property Assignment and License filed with the Court contradict Defendants' position regarding Plaintiff's exclusive license (ownership) of the Video Poker Games. Defendants further argue that (1) none of these items demonstrate that the video poker games involved or referenced the "Michigan Superstar" video poker game, and (2) the Certificates of Registration with the U.S. Copyright Office reference an entirely different group of video poker games than those that Plaintiff discusses in this lawsuit. Again, the Court finds that the documents submitted by Plaintiff demonstrate otherwise. For these reasons, the Court concludes that Plaintiff has demonstrated a substantial likelihood that it is the exclusive licensee (owner) of the Video Poker Games in Michigan.

*2. Copying*

Turning to the second element, Plaintiff asserts that Defendants engaged in the illegal copying of the Video Poker Games by using the Eprom chip burner and ultraviolet eraser, both before and after the TRO was issued by this Court. As such, Plaintiff argues that Defendants have shown contempt for Plaintiff's intellectual property and the judicial process. For the reasons that follow, the Court agrees.

First, as the affidavits of Carson and Daniel Domek allege, Defendants engaged in illegal

8

copying of the Video Poker Games in January 2008. Second, after the TRO was issued but prior to the March 27, 2008, hearing, the U.S. Marshal Service caused 72 machines to be seized from 33 locations pursuant to the TRO. In the days after the March 27, 2008, hearing, however, Plaintiff asserts that Mirch went to locations where the games had been seized and told the owners of those locations that he was entitled to replace the seized games and then he did so. Affidavits attested to by Pauley and others support Plaintiff's assertions that the replacement games installed by Defendants included "knock-off chips," thereby violating the TRO.[3]

In addition, Plaintiff asserts that when William Kroger[4] went to look at the machines, it was discovered that Defendants had removed infringing video games from the storage facility where seized games were being held (and/or the U9 chips discovered during the March 21, 2008 search had been removed). Further, when Mr. Kroger went to some establishments to inspect games that had not yet been seized, it was discovered that games not previously seized also were infringing games.

As to the replacement games, Defendants contend that, over the years and prior to entering into any relationship with Plaintiff, Defendants bought or legally obtained "a number of games" from a Merit-authorized distributor in Michigan. Defendants also state that they acquired

---

[3] Plaintiff reminds the Court that this was the same type of behavior that Mirch engaged in when he had to return authorized game boards to the Oakland County Circuit Court on January 23, 2008, and Defendants' behavior is what led Plaintiff to file this action and seek the TRO now in effect. Plaintiff therefore argues that a preliminary injunction requiring the seizure of all infringing boards and equipment that can be used to create "knock off" needs to be entered in order to prevent Mirch from continuing in the same illegal activities.

[4] Pursuant to the Standstill Agreement, Mr. Kroger is the person the parties agreed would conduct the inspections of seized and non-seized games to determine if there was any infringement by Defendants)

9

approximately 200 games from a business owned by Mirch's father. The timing of these acquisitions is unclear. Defendants have not supplied the Court with any receipts or documentation and Mirch's affidavit refers to the early 1980s (although Mirch would have been very young at that time). Nonetheless, Mirch asserts that any "new" games he put in machines after the Video Poker Games were returned in January 2008 (and, presumably, the machines he updated after the March 27, 2008 hearing as well) came from this old inventory of games that Mirch had. Mirch states that such games were tuned up and delivered and installed at customer locations. Mirch asserts that there was no counterfeiting of Plaintiff's games at any time.

Plaintiff counters that, even if Defendants bought games that were copyrighted by Merit, Riviera acquired those copyright rights in 2004, and then registered enhanced versions of the original Merit games with the U.S. Copyright Office. Therefore, Plaintiff argues, Riviera (and Plaintiff, as Riviera's exclusive licensee in Michigan) has rights in all versions of the Video Poker Games, including earlier versions. Accordingly, even if Defendants did have some earlier version(s) of the Video Poker Games, Defendants would be infringing those versions each time Defendants made a copy of them. The Court finds that Plaintiff's position is supported by the terms of the License, as discussed above.

For the foregoing reasons, the Court finds that there is a substantial likelihood that Defendants have engaged in illegal copying of the Video Poker Games, both before and after the Court issued the TRO.

*3.     Conclusion*

For the reasons set forth in Sections IV.A.1 and 2 above, the Court concludes that Plaintiff

has demonstrated that there is a substantial likelihood that it will succeed on the merits.

**B.      Irreparable Injury**

Plaintiff asserts that it will suffer irreparable injury if a preliminary injunction is not issued. "In the copyright context, much rests on the first factor [of the four part test] because irreparable harm **is presumed** once a likelihood of success has been established . . . and because an injunction likely will serve the public interest once a claimant has demonstrated a likelihood of success in this setting." *Lexmark Intl. Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532-33 (6th Cir. 2004) (emphasis added). As set forth above, the Court has concluded that Plaintiff established a substantial likelihood of success; irreparable harm to Plaintiff is therefore presumed. Although Defendants assert that there is no irreparable harm to Plaintiff, they do not explain why and accordingly fail to overcome the presumption of irreparable harm to Plaintiff.

In addition, the Court finds that the threat of irreparable injury is even greater in this case because Defendants repeatedly have engaged in illegal copying in defiance of copyright laws, and in violation of orders of this Court as well. As the record reflects, Defendants copied Plaintiff's licensed copyrights:

1.  Before the Lease Agreement was executed in April 2007 (as admitted by Defendants therein),

2.  On the eve of the preliminary injunction in the Oakland litigation (as sworn to by Carson and Daniel Domek, the former employees of Coin-Op who participated in the illegal copying of the Video Poker Games through the use of the Eprom chip burner and ultraviolet eraser in January 2008), and

3.  Even after the Court issued the TRO and related orders in April and May 2008 (as evidenced by additional affidavits submitted by Plaintiff).

Accordingly, the Court concludes that Plaintiff will suffer irreparable harm if the preliminary injunction is not issued.

**C.     Substantial Harm to Others**

Plaintiff contends that the granting of a preliminary injunction will not cause substantial harm to others, and Defendants do not address this issue. In this case, the Court finds that, to the extent that there is any harm to others upon issuance of a preliminary injunction, any such harm would be to restaurant and bar owners whose businesses might be disrupted as machines are removed from their establishments (or even as the machines are inspected). The Court concludes, however, that such harm is negligible because a bar or restaurant owner does not have a right to maintain any machine(s) containing infringing materials in the establishment. For the foregoing reasons, the Court finds that this factor does not merit much weight in determining whether a preliminary injunction should issue in this case.

**D.     Public Interest**

As Plaintiff states, when there is copyright infringement, the public has an interest in upholding copyright protections. *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983). Again, Defendants do not address this issue. Accordingly, as the Court has concluded that there is a substantial likelihood that Defendant has infringed on the licensed copyrights of Plaintiff, the Court finds that this factor favors the issuance of injunctive relief.

**E.     Defendants' Equitable Arguments**

As evidenced above, Defendants have asserted little legal argument pertaining to the four factors the Court is to evaluate when deciding whether to issue a preliminary injunction. Instead, Defendants have asserted a number of equitable defenses which they claim should bar the relief sought by Plaintiff. The Court briefly examines Defendants' arguments.

   *1.     Action has been brought for Improper Purpose*

Defendants argue that the purpose of this action is to cause a devaluation of the corporate stock of Coin-Op, which Plaintiff is attempting to take over at a "fire sale price." According to Defendants, on January 21, 2008, Plaintiff's owner, Mirch and others were assembled at the offices of the corporate attorneys for Coin-Op to discuss a possible take over of Coin-Op by Plaintiff. The meeting allegedly terminated prematurely when Coin-Op's corporate attorney would not agree to one or more releases requested by Plaintiff. Even if these allegations are true, however, the Court finds that they have no bearing on the legitimacy of Plaintiff's lawsuit, nor do they give reason for the Court to deny injunctive relief.

2.  *Bond*

Plaintiff failed to post bond before Machlay and the Plaintiff Group went to Coin-Op on March 21, 2008, to seize the equipment described in the TRO. As set forth above, no equipment was seized at that time, and a Surety Bond was obtained by Plaintiff almost immediately thereafter. Defendants also argue that the Surety Bond does not contain any provisions that would suggest the conditions which would result in a violation of the TRO or Surety Bond, such that the surety would be liable under the bond. On the face of the Surety Bond, however, it clearly states that Plaintiff and the surety (International Fidelity Insurance Company) "are hereby bound, jointly and severally to the Defendant, to pay damages, if any, awarded to the Defendant by the Court caused by a court finding of wrongful issuance of the TRO, in an amount not to exceed a total of One Hundred Thousand ($100,000.00) and 00/100 Dollars." The Court therefore finds that (a) Defendants did not suffer any injury by Plaintiff's failure to obtain the bond before going to the Coin-Op premises on March 21, 2008, and (b) Defendants have recourse in the event Plaintiff wrongfully obtained the TRO. As such, the Court concludes that this issue does not weigh in favor of denying Plaintiff's

13

request for a preliminary injunction.

        3.      *Unclean Hands*

Defendants also argues that one or more of Plaintiff's attorneys still represented Mirch on unrelated matters when the Oakland litigation was filed and during some of the Oakland litigation. The Court does not find that the representation provided by such attorneys in the Oakland litigation to be relevant in the present matter. Moreover, there is no suggestion that any attorney in this case continued to represent Mirch or Coin-Op during the pendency of this case or on any matter at issue in this case. Accordingly, the Court concludes that this argument does not weigh against the issuance of a preliminary injunction.

**F.    Conclusion**

After weighing all the relevant factors of the four-part test, as well as Defendants' equitable arguments, the Court finds that the facts and circumstances in this matter weigh heavily in favor of issuing the preliminary injunction requested by Plaintiff. In addition, the Court concludes that Defendants have failed to demonstrate any meritorious reason why a preliminary injunction should not issue in this matter. Accordingly, the Court grants Plaintiff's motion for preliminary injunction.

## V. MISCELLANEOUS

**A.    Bankruptcy**

Coin-Op filed for bankruptcy on July 22, 2008. Mirch individually filed for bankruptcy on October 7, 2008. Pursuant to applicable bankruptcy law, an action against a debtor is typically stayed automatically when the bankruptcy petition is filed. *See* 11 U.S.C. §362. In the Coin-Op bankruptcy case, the bankruptcy court entered an order lifting the automatic stay with respect to this

case (*i.e.*, this case could go forward, although no monetary judgments can be enforced). Thus far, however, no similar order has been provided to the Court in the Mirch bankruptcy case. Nonetheless, for the following reasons, the Court holds that the Mirch bankruptcy proceeding shall not impede the issuance of a preliminary injunction in this matter:

    (1)    Plaintiff has moved to have an order entered lifting the stay in the Mirch bankruptcy case,

    (2)    The Mirch bankruptcy matter is pending before the same Bankruptcy Judge who is handling the Coin-Op bankruptcy, and

    (3)    The matters at issue in this motion for preliminary injunction involve injunctive relief (as opposed to monetary relief).

**B.**     **Polygraph Results**

Defendants submitted to the Court results of a polygraph examination taken by Mirch. In the accompanying polygraph report, the examiner concluded that Mirch was being truthful when Mirch said:

    (a)    He possessed original Merit poker games prior to entering the Lease,

    (b)    His Merit poker games are not the same as Plaintiff's licensed games,

    (c)    He did not counterfeit any of Plaintiff's games,

    (d)    He did not instruct Domek to counterfeit any games,

    (e)    He did not use any copies of Plaintiff's games at his location, and

    (f)    He was using only original Merit software at the time this case was filed.

Plaintiff has filed a motion to strike the polygraph results because:

    (1)    Plaintiff was not given notice of the examiner or the opportunity to be present or submit questions,

    (2)    The questions are general and grossly misleading, and

15

(3) The reports/answers are contradictory to affidavits of Domek and Carson, the inspection of the Coin-Op warehouse and the games seized pursuant to the Court's order.

Defendants did not file a response to Plaintiff's motion and the time for responding has long since passed. For the reasons argued by Plaintiff, the Court grants Plaintiff's Motion to Strike the Polygraph Report.

## VI. CONCLUSION

Accordingly, for the reasons set forth above, the Court hereby GRANTS Plaintiff's Motion for Preliminary Injunction and GRANTS Plaintiff's Motion to Strike Polygraph Report.

Therefore, until further order of this Court, IT IS HEREBY ORDERED that Defendants, their directors, officers, agents, servants, employees, and all persons in active concert, privity, or participation with them who receive actual notice of this order are restrained from:

1. operating, copying, reproducing, selling, offering for sale, or displaying;

2. transferring, moving, relocating, disposing of, dissipating, discarding, secreting, or hiding;

3. tampering with, modifying, changing, converting, altering, adjusting, repairing, amending, revising, or varying

any video poker game that incorporates, is copied from, infringes upon, is derivative of, or is an enhancement of the Merit "Superstar" or "Americana" video poker games or the computer source code from which they derive, copyrights for which are owned and/or exclusively licensed by Plaintiff, including, but not limited to: any such complete video poker games; computer or circuit

board(s); U9 computer chip(s); computer equipment; or any other electronic storage devices, including DVDs and/or computer storage disks upon which computer code may be stored.

IT IS SO ORDERED.

                                                      s/Lawrence P. Zatkoff  
                                                      LAWRENCE P. ZATKOFF  
                                                      UNITED STATES DISTRICT JUDGE

Dated: December 4, 2008

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on December 4, 2008.

                                                        s/Marie E. Verlinde  
                                                      Case Manager  
                                                      (810) 984-3290